Josephine J. CHAVIS, Plaintiff,

v.

**WHITEHALL LABORATORIES, INC., Defendant.**

No. 83–0467.

United States District Court,
N.D. Indiana,
South Bend Division.

Aug. 29, 1986.

John O. Moss, Indianapolis, James D. Stevens, Elkhart, for plaintiff.

Martin W. Kus, LaPorte, for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The plaintiff in this case alleged that defendant, Whitehall Laboratories, Inc. (Whitehall), discriminated against her in her employment on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq* (Title VII) and 42 U.S.C. § 1981. The plaintiff's Title VII claims were tried by the court without a jury on June 25 and 26, 1986. The parties were given an opportunity to file briefs on the law and the evidence and have done so. Oral argument was heard in this case on August 14, 1986. This memorandum and order contains the findings of fact and conclusions of law thereon pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

Whitehall manufactures pharmaceutical products, including over-the-counter drugs such as pain remedies and cold remedies in the form of tablets, capsules, creams, lotions and suppositories. It manufactures many of those products from the raw material ingredient level through the finished bulk product and then packages the product for shipment to its customers. In the summer of 1982, Whitehall employed approximately 700 employees and 13% to 14% of those employees were black persons. Those 700 employees included approximately 85 to 90 in management and 90 in the office, 65 to 67 that were part of a laboratory bargaining unit and 470 employees that were part of a factory bargaining unit. The laboratory unit was represented by Local 7–838 Oil, Chemical and Atomic Workers International Union which was affiliated with the AFL–CIO. The factory unit was represented by a separate Local, Local 7515, but was the same International Union.

The plaintiff is a black female and was first employed by Whitehall on March 8, 1976 as a line inspector in production and had a seniority date of March 10, 1976. She held the position of line inspector for about 4 years and then became a bulk checker. Her technical job classification was Laboratory Technician, group 1. As a bulk checker, her duties included watching the mixers and weighing and mixing the ingredients for various products such as Anacin, Dristan, Sleep Ease, cough syrup, Denarex, and heat linament. Her job duties also included inspecting equipment for cleanliness. Josephine Chavis was a member of Local 7–838 and under the collective bargaining agreement between Whitehall and Local 7–838, was not required to lift more than twenty-five (25) pounds on a regular basis. Josephine Chavis was aware of the provisions in the collective bargaining agreement.

In 1964, Whitehall and Local 7–838 negotiated a point system on absenteeism as part of their labor contract at the request of the union. Under the point system which only covered unexcused absences, an employee was given one point per unexcused absence regardless of the length of the absence. When an employee received a certain number of points, the employee was warned and when the employee received 15 points in one year, the employee was terminated.

From 1964 through 1975, the absentee rate increased, ranging from 6% to 12%, and from 1976 to 1980, the absentee rate averaged between 10% and 12%. These percentages were about 4 times the national absentee average of 2.5% to 2.7%. These high plant-wide absences cost the company money because they had to carry a tremendous number of employees to cover the absenteeism and also caused problems with scheduling, leaves and vacations. In an effort to cure this progressively wor-

sening absentee problem, Whitehall met with both local unions in joint session in 1980 and told them that the attendance program had to be tightened up. The union was reluctant to make any changes but Whitehall said that the absence program had to be tightened up or the company would take things into its own hands under the Management Rights Clause contained in the labor agreement to control excessive and pattern absences by employees. The union agreed to some tightening.

The absentee rate continued to climb after the 1980 negotiations. Whitehall posted notices with respect to the absentee rate noting that a small percentage of people accounted for a large percentage of absences. In 1981, Whitehall began tracking absentee rates on an individual basis and if excessive or pattern absences by an individual were detected, the company looked at the employees attendance record for the previous four years to see if that individual had consistently been absent that much or had a regular absence pattern. In December 1981, Whitehall met with the unions, including International representatives thereof, to discuss the problem of pattern and excessive absences. At that time, Whitehall instituted its second absence control policy dealing specifically with pattern and excessive absences under its Management Rights Clause. This policy was not based on whether an absence was excused or unexcused but rather focused on total absences. Whitehall identified 40 employees with pattern or excessive absences, 33 of which had excessive absences based on the attendance records of the employees from 1978 through 1981. The plaintiff, Josephine Chavis, had the highest rate of absences of all employees plant-wide. The new policy included counseling the employees on their absentee problems. The union requested to talk to the employees first and it did and then the company counseled the employee with a union representative present.

On January 13, 1982, Whitehall sent a letter to all bargaining unit employees advising them of the new policy on pattern and excessive absences and indicated that those employees who have an unacceptable attendance record would be notified in writing and that discipline would follow unless their attendance record significantly improved. The same day, letters were sent to the 33 employees identified by Whitehall as having excessive absences. Those 33 individuals included 10 black employees and 23 Caucasian employees. As one of the 33, Josephine Chavis received notice that her absences from work for the years 1978 through 1981 were excessive and that her absence rate for those years was as follows: 1978—180⅜ days or 75.5%; 1979—143⅜ days or 60%; 1980—160⅞ days or 67.1%; and 1981—124⅘ days or 52.1%. Plaintiff was advised that her attendance record had to show immediate, significant improvement and that failure to do so could result in discipline up to and including termination.

The plaintiff was counseled on her absences on January 28, 1982 as she had been many times before. In January 1982, the plaintiff was absent 11⅘ days, including 4⅘ days after the January 13 letters had been sent to her. Plaintiff was again absent on February 1, 1982 and was first terminated on February 2, 1982 for excessive absences. The union contested the termination, filed a grievance and took the matter to arbitration. A full and formal arbitration hearing was held on the grievance before arbitrator James R. Cox on March 11, 1982. Josephine Chavis was present at the hearing and heard the company's position on excessive absenteeism. On March 17, 1982, the arbitrator issued his Decision and Award finding that Josephine Chavis was a "classic case of a chronic absentee" and that her absenteeism record was "grossly excessive". The arbitrator also found that the company was not prohibited from disciplining employees with excessive absences under its second absentee control program which dealt with the problem of too many absences over a period of time longer than one year irrespective of the reason for the absence. However, "despite her previous abysmal record of attendance," the arbitrator found that Josephine Chavis was not given a fair opportunity to improve her attendance record

after the new policy was announced on January 13, 1982 and ordered that she be reinstated immediately. The arbitrator concluded his decision as follows:

> Grievant should not misconstrue this Award as indicating that she is not vulnerable to termination for chronic and excessive absenteeism unless she makes a prompt and immediate turnaround in her attendance record.

The plaintiff was reinstated by Whitehall on March 18, 1982 but did not report to work until April 27, 1982. During the time plaintiff was off work from February till April 27, 1982, she had surgery.

On April 23, 1982, another letter on the new attendance policy was sent to all bargaining unit employees that noted that the absence rates were trending upward and that an employee's job was in jeopardy unless the employee after counseling made dramatic and immediate improvement in his or her attendance record. Josephine Chavis was counseled upon her return to work on April 27, 1982 by Mary Jo Luke, assistant personnel director for Whitehall with union steward Joan Strausborger present. Ms. Luke told plaintiff at that time that her attendance had to improve. Josephine Chavis was aware of her poor attendance record and that she could be terminated because of continued absences, whether excused or unexcused, under the second attendance policy. On June 3, 1982, the plaintiff was absent ½ day because she had to pick up her daughter from the baby-sitter since the baby-sitter had gone into labor. Her supervisor, Steve Mohler, gave her permission to leave.

On June 7, 1982, Mr. Mohler instructed plaintiff to inspect an abbey machine which was part of her job function. Such an inspection usually takes from 20 to 45 minutes and bulk checkers are not required to inspect the parts in any particular order. Inspecting requires that the abbey parts be picked up and turned over to make sure they were clean. Usually a mixer who would clean the equipment would assist the bulk checker in the inspection because the inspection required the lifting of an 88 pound mill plate. It was not mandatory to lift the mill plate and usually the bulk checker would wait for a mixer before finishing the inspection. The plaintiff proceeded to inspect the kettle parts and then picked up the mill plate without the assistance of a mixer. A mixer was available to assist plaintiff and she knew that she was not to lift the plate because of its weight as provided in the labor contract and had been assisted in the past by mixers. Mr. Mohler did not order the plaintiff to lift the mill plate nor did he speak to her in a racially derogatory manner when he gave her the job assignment.[1] Plaintiff was alone at the time she inspected the machine and hurt her back within 15 minutes of being requested to make the inspection when she picked up the mill plate. Plaintiff violated company policy by lifting the mill plate without assistance and exercised poor judgment in doing so.

Josephine Chavis left the abbey room and told Mr. Mohler that she had hurt her back. He gave her a slip to go see the company nurse, Marge Danner. The nurse referred her to the Simpson Clinic where she saw Dr. Blume. Dr. Blume gave her

1. Steven Mohler never treated plaintiff in a racially derogatory manner. At trial, plaintiff testified that Mr. Mohler made comments to her about the jewelry she wore, the kind of car she drove and that she purchased shoes for her child at Paul Thomas and that she found these comments as well as his tone of voice to be offensive because she didn't like people to make comments about her personal life. Plaintiff admitted, however, that she never asked Mr. Mohler not to talk to her about her personal life. The plaintiff also testified that Mr. Mohler spoke to her with a cocky, arrogant attitude but admitted he had that attitude generally and also admitted that he spoke to Caucasians in the same manner. Plaintiff also felt that Mr. Mohler was not concerned about her as a person and felt that Mr. Mohler was more cordial and friendly with whites than with blacks. Finally, the plaintiff testified that Mr. Mohler treated her more severely by giving her less desirable jobs than she was entitled to because of her seniority and under the rule of practice on occasion. However, plaintiff admitted that an employee could not pick and choose jobs based on seniority and that she would request to speak to the union steward about the assignments sometimes and Mr. Mohler would permit her to do so.

medication. Plaintiff missed ⅛ day of work on June 7, 1982, was absent June 8 and 9, returned to work on June 10 and 11 and part of June 12, 1982 and was then absent until she was discharged on August 13, 1982. Dr. Blume saw plaintiff 3 days after the incident, did an ultra-sound and told her to see a specialist.

Josephine Chavis saw Dr. Louis Charles Sfreddo, M.D., an orthopedic surgeon on June 14, 1982 and explained what happened. She stated that she had immediate low back pain followed by some left leg pain in the posterior aspect of her thigh and slightly below the knee into the calf area. Dr. Sfreddo examined plaintiff and his objective findings included a decreased range of motion in her back with particular regard to flexion, extension and lateral motion and pain on straight leg raising although he found no neurological deficit and x-rays of her lumbo sacral spine were normal and her reflexes were within normal limits. Dr. Sfreddo thought plaintiff had some nerve root irritation possibly from a very small disc protrusion or sciatic type pain. The physician took plaintiff off work for 2 weeks, gave her medication and instructed her regarding bedrest and conservative management. Dr. Sfreddo notified Whitehall that he anticipated plaintiff would return to work on June 28, 1982 and that he was scheduled to see her again on June 25.

Dr. Sfreddo checked plaintiff on June 25 and she had the same complaints. He felt there was still some nerve root irritation so he recommended doing a caudal block and extended her work leave to July 19, 1982 because of her back discomfort. Dr. Sfreddo relied on plaintiff's history as to the level of back discomfort and the continued objective finding of decreased range of motion to make his recommendation to stay off work.

Josephine Chavis had the recommended caudal block and Dr. Sfreddo again saw her on July 7, 1982. Based on information from the plaintiff, the caudal block afforded little or no improvement with respect to her back discomfort. On examination, Dr. Sfreddo only found minimal objective findings but the plaintiff was still complaining she could not go back to work so Dr. Sfreddo could not force her to do so. Dr. Sfreddo suggested she return to work in three weeks.

On July 2, 1982, plaintiff saw Dr. Morris S. Friedman, M.D., at the request of Whitehall. Upon examination, Dr. Friedman found no objective findings to confirm her subjective complaints and recommended that she return to work. Dr. Friedman sent notice of his opinion to Whitehall in a letter dated July 8, 1982.

In a medical report to Whitehall on July 30, 1982, Dr. Sfreddo indicated that he failed to find any objective findings with regard to plaintiff's back problems and that plaintiff's complaints were subjective. He noted that he would recommend to plaintiff that she return to work if she would so request but that he could not force her to return to work and therefore had no alternative but to keep her off work for 3 more weeks. At trial, plaintiff testified that she could have returned to work the first week of August, 1982 but never told Dr. Sfreddo that or asked him for a release to return to work.[2]

2. The plaintiff continued to see Dr. Sfreddo after her termination from Whitehall. On August 16, 1982, immediately after she received her termination notice, she told Dr. Sfreddo that she had pain in both arms and both legs and back. On examination, Dr. Sfreddo could find no objective findings to support plaintiff's complaints. The physician recommended physical therapy and at her appointment on September 1, 1982, the pain in her arms and legs had improved. At that point, Dr. Sfreddo started her on exercises. The plaintiff also saw Dr. Papadapolous at some time for a second opinion although the record does not disclose what his opinion was. The plaintiff also went to the Pain Clinic in South

Bend some time after her termination but did not receive any treatment there because they didn't feel that they could help her.

The plaintiff had seen Dr. Sfreddo in 1978 for low back pain but that was completely resolved according to Dr. Sfreddo. The plaintiff was also treated by Dr. Papadapolous in 1981 after she was involved in an automobile accident in which plaintiff sustained sprains to her spine.

In September 1984, the Industrial Board of Indiana, pursuant to an agreed stipulation of settlement, found that plaintiff had sustained a permanent partial impairment of 4.5% of the woman as a whole as a result of the June 7,

On June 8, 1982, Donald J. Boveri, Plant Manager at Whitehall, learned of plaintiff's injury and began monitoring the situation because of her very poor attendance record especially during the summer months. When Whitehall received the report from Dr. Sfreddo and Dr. Friedman indicating that neither physician could find any objective findings and that her complaints were subjective, Mr. Boveri reviewed the plaintiff's entire work record and medical file because the union usually requested such a review. The plaintiff's medical file reveals that she has a lot of medical problems during the years she worked at Whitehall. Josephine Chavis' attendance records indicated the numerous days she had been absent from work as well as that she had been warned of tardiness 11 times; warned of absences 8 times; suspended for tardiness twice; suspended for absences once; and terminated for excessive absences on 1 prior occasion. Further, not counting the 33 working days that plaintiff was off from February 2 until March 18 when she was reinstated, plaintiff had been absent from work in 1982 for about 86 days, including being continuously absent from June 14.[3] Delvin M. Dudek, personnel Director for Whitehall recommended the termination and the decision to terminate was made by Donald J. Boveri, Assistant Vice-President and Plant Manager for Whitehall without any input from any other individuals. Mr. Boveri instructed Mr. Dudek to inform plaintiff by mail of her termination which he did by letter dated August 12, 1982. Her termination letter noted that she had been absent continuously since June 14, 1982 and that she was being terminated for continued excessive absenteeism. Mr. Boveri knew that Josephine Chavis was off work due to her back injury when she was terminated. The plaintiff never spoke with Mr. Boveri about her termination. Whitehall did not call Josephine Chavis just prior

to her termination and advise her that she would be terminated if she did not return to work nor did Whitehall counsel with her immediately prior to her termination although the company had met with her many, many times and warned her about her absences.

On August 23, 1981, Local 7–838 notified Whitehall that the union did not agree with Whitehall's decision to terminate Josephine Chavis but that it did not wish to go to arbitration. Further, the union did not request that the plaintiff be given an option to resign.

In accordance with the provisions of the labor agreement between Whitehall and Local 7–838, a bid was posted on the bulletin board near the laboratory for Josephine Chavis' position on August 17, 1982. Two individuals responded: Carolyn Hull, a Caucasian female and Georgia Abernathy, a black female. The bid was awarded to Georgia Abernathy based on her seniority effective August 23, 1982.

From January 1, 1981 until January 1, 1984, 11 individuals with absence problems have left the work force at Whitehall by termination, resignation, early retirement or disability retirement. This group of individuals included 7 Caucasians and 4 blacks. Josephine Chavis is among the group of 4 blacks and was the first individual to be terminated under the continued excessive absentee program. She was also the employee with the worst attendance record at Whitehall for the years 1978 through 1981 with an average number of days absent of 152⅛ days representing an absence rate of 64%. Two of the individuals, both Caucasian females with absentee problems were given the option of taking early retirement because of their seniority and eligibility to receive pension benefits. Josephine Chavis was not eligible to receive

1982 injury. The Industrial Board awarded her Workman's Compensation Benefits accordingly.

**3.** The plaintiff testified that she had surgery, a dural epectomy and returned to work as promptly as she could when called after her reinstatement and that she still had stitches and a drainage tube when she returned. Thus, in light of the fact that she was reinstated on

March 18 and did not return to work until April 27 because of recovering from surgery, the court concludes that her absence during that time must be attributable to medical reasons. The record in this case reveals that plaintiff had a lot of medical problems during the time she worked for Whitehall.

pension or retirement benefits at the time of her termination. Others were terminated and in subsequent hearings after the employee had been notified of the termination, the union requested that the employee be permitted to resign. The union made no such request on behalf of Josephine Chavis.

At trial, plaintiff testified that in May 1982 she had a conversation with Commie Walls, the supervisor of production for Whitehall who was also a black person. In that conversation, Commie said "Hey Babe" and in a chuckling voice said "Don is gonna get your ass." The plaintiff also called Dorothy Williams, Nathanial Hart and Mark Suggs as witnesses. Dorothy Williams testified that she thought blacks were treated less favorably and related an experience she had when she was given a job assignment in a dusty room and could not recall any instances where whites were similarly treated. She also testified that she was terminated for sleeping on the job and that another Whitehall employee was only suspended for sleeping on the job. Nathanial Hart, a union steward for the other Local at Whitehall, testified at trial that he was told that Josephine Chavis was discharged because of her race though he did not identify who told him that. He also testified that he thought blacks were treated more severely. Mark Suggs testified that he felt he was a victim of discrimination because of the discipline he received for making errors on the job.

The court has jurisdiction of the subject matter in this case pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Whitehall is an employer within the meaning of Title VII and the court has personal jurisdiction over the parties.

Title VII forbids an employer "... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, condition, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e—2(a)(1). A plaintiff may pursue a Title VII claim under either a disparate treat-

ment or disparate impact analysis. The plaintiff's claim in this case is that she was discriminated against on the basis of her race when terminated by Whitehall on August 13, 1982. Her claim is based on the disparate treatment theory of discrimination under Title VII. No claim has been made nor argument advanced by plaintiff with respect to disparate impact nor had plaintiff claimed any discrimination by defendant on the basis of her sex.

In Title VII cases based on disparate treatment, proof of discriminatory intent is critical, *see, e.g., International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), and the plaintiff has the ultimate burden of showing intentional discrimination, i.e. that the employer was treating some people less favorably than others because of race, color, religion, sex or national origin. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Nellis v. Brown County,* 722 F.2d 853, 856 (7th Cir. 1983). The Supreme Court of the United States has enunciated a method of proof to assist the court in determining whether a plaintiff has met her burden of proof in a Title VII disparate treatment case. *See, e.g., Texas Dept. of Community Affairs v. Burdine, supra; McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas* as clarified and explained in *Burdine,* a plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. If a plaintiff established her *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its decision and if the defendant does so, the plaintiff must prove that the employers articulated reason is actually a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine, supra; McDonnell Douglas Corp. v. Green, supra; see Cooper v. Federal Reserve Bank*

*of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 2799, 81 L.Ed.2d 718 (1984).

■ The *prima facie* case element of the *McDonnell Douglas* test is flexible and may be adapted to the fact situation as appropriate. *See, e.g. Burdine,* 450 U.S. at 252 n. 5, 101 S.Ct. at 1093 n. 5; *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d 508, 511 n. 4 (7th Cir. 1986). To establish a *prima facie* case of discriminatory discharge, a plaintiff must show: (1) she belonged to a racial minority; (2) she was doing her job well enough to meet her employer's legitimate expectations; (3) in spite of her performance, she was discharged; and (4) the employer sought a replacement for her and hired a non-minority person to perform the same work. *See, e.g., Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d at 511; *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984); *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277, 1282 (7th Cir.1977). Successfully establishing a *prima facie* case gives rise to an inference or rebuttable presumption of discrimination but it is not the equivalent of a factual finding to that effect. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978); *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d at 512.

■ Once a plaintiff makes the required *prima facie* showing, the employer must produce evidence that the plaintiff was discharged for a legitimate, nondiscriminatory reason. *Burdine, supra* 450 U.S. at 254, 101 S.Ct. at 1094; *Yarbrough, supra* at 511; *See Cooper v. Federal Reserve Bank of Richmond,* 104 S.Ct. at 2799. The employer's burden is only one of production, not persuasion and an employer can accomplish this by introducing admissible evidence of the reasons for its employment decision.

■ If a defendant carries its burden of production, the presumption raised by the *prima facie* case is rebutted and the

factual inquiry leads to a new level of specificity: the plaintiff must then show that the employers proffered reason is merely a pretext for discrimination. A plaintiff can show pretext in one of two ways: (1) that the employer was more likely motivated by a discriminatory reason; or (2) that the employer's proffered reason is unworthy of credence. *Burdine, supra* 450 U.S. at 253–54, 101 S.Ct. at 1093; *Yarbrough v. Tower Oldsmobile, Inc.,* 789 F.2d at 513; *Johnson v. University of Wisconsin-Milwaukee,* 783 F.2d at 63; *Klein v. The Trustees of Ind. University,* 766 F.2d 275, 282 (7th Cir.1985). A plaintiff can show that the employer's proffered reason is unworthy of credence in 3 ways: (1) the company's reasons have no basis in fact; or (2) if they have a basis in fact, by showing that they were not really motivating factors; or (3) if they are factors, by showing they were jointly insufficient to motivate the adverse employment decision, i.e., the proffered reason was so removed in time that it was unlikely to be the cause or the proffered reason applied to other employees with equal or greater force and the company made a different decision with respect to them. *See, La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1414 (7th Cir.1984). At this point, the court must decide the ultimate question of whether the particular employment decision at issue was made on the basis of race which in the final analysis requires the court to decide "which party's explanation of the employer's motivation it believes." *Cooper v. Federal Reserve Bank of Richmond,* 104 S.Ct. at 1799; *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

■ The plaintiff has shown that she is a member of a racial minority, that she was doing her job satisfactorily, that she was discharged and that Whitehall sought a replacement for her. However, the evidence reveals that Whitehall hired Georgia Abernathy, a black female, to fill the position.[4] Although the fact that a black per-

---

**4.** The plaintiff maintains that the fourth element of the *prima facie* case is not significant nor essential because the act of discrimination occurred at the time of her discharge and what

son was hired to fill Josephine Chavis' position would appear to undercut any inference or rebuttable presumption that plaintiff was discharged because of her race, the company's choice of Georgia Abernathy was made pursuant to the labor contract between Whitehall and Local 7–838 so the court will assume that plaintiff has shown a *prima facie* case.

The burden then shifted to Whitehall to articulate a legitimate, nondiscriminatory reason for her discharge, which it has done—her abysmal record of excessive absences from work. The defendant presented evidence that Josephine Chavis had the *worst* average attendance record of Whitehall employees for a period of more than 3 years and that her attendance record was that of a chronic absentee. The plaintiff was discharged pursuant to a legitimate company policy on excessive and chronic absenteeism and plaintiff was well aware of the policy, having been given adequate notice. Accordingly, under the method of proof set forth above, the burden shifted back to the plaintiff to show that the proffered reason was merely a pretext for discrimination which burden merged with her ultimate burden of persuading the court

that she was a victim of intentional discrimination.

The record in this case reveals that Whitehall's proffered reason has a basis in fact and that her absence record was a factor in its decision to terminate her. Whitehall had instituted an attendance policy specifically directed at excessive absenteeism and had informed the plaintiff of the policy.[5] Whitehall had discharged her for excessive absenteeism under the same policy only 6 months prior to the August termination but had to reinstate her under an Arbitrator's decision that found she had not been given a fair opportunity to improve her attendance record. Plaintiff was reinstated March 18 but did not return to work until April 27. Although her attendance record was good in May, she was continuously absent from June 14 until her termination in August.[6] Thus, the reason was not removed in time. Finally, the record reveals that the excessive absenteeism policy was not applied differently to Caucasian employees than it was to plaintiff. Whitehall terminated 11 employees for excessive absenteeism, 4 blacks including plaintiff, and 7 Caucasians. Thus, more Caucasian employees were terminated for absenteeism than blacks. Further,

the company did after that was immaterial. This argument does not have a basis in law. The fourth element of *prima facie* case of discriminatory discharge is just as important as the other elements to give rise to an inference of discriminatory intent. It is not a violation of Title VII to discharge a person who is black or has the other characteristics protected by Title VII. It is only a violation if the individual was discharged based on that characteristic, ie. if the employer acted with discriminatory intent in making its decision. The fourth element is critical with respect to this aspect of a discrimination case.

**5.** The plaintiff maintains that Whitehall should have contacted her and her union and counseled with her before terminating her, specifically informing her that if she didn't come to work she would be terminated. The record in this case reveals that plaintiff was well aware of the absentee policy and had received numerous warnings about possible termination if her attendance record did not improve. Further, the fact that she was not called in does not indicate that Whitehall had any intent to discriminate against her in making its termination decision.

**6.** The plaintiff argues that Whitehall was not permitted to consider any of plaintiff's absences from work prior to the Arbitrator's decision and the time before she returned on April 27, 1982 and that such consideration was erroneous. Whether such consideration was erroneous is not a critical factor in this case. The issue is whether Whitehall made the decision to terminate Josephine Chavis on the basis of her race. Further, Title VII does not preclude a company from considering an employee's entire record of absenteeism in making employment decisions as it would appear that such consideration would assist a company in making a fair decision. For example, if an employee had a very good attendance record in the past and was absent for medical reasons for one 2 month period, it would be unlikely that a decision to terminate would be fair in such circumstances. That scenario, however, is not the case with Josephine Chavis. The plaintiff had a bad attendance record and this was not the first time she had been absent from work for medical reasons. Although such absences may be legitimate and excusable, it is basically undisputed that a high absentee rate causes problems for an employer.

the fact that the plaintiff was the first one terminated under the policy does not show that Whitehall's proffered reason was a pretext since plaintiff had the *worst* attendance record.

The plaintiff argues that Whitehall treated her differently than similarly situated whites because it did not give her the same options that it did certain white employees, specifically the options to resign or take early retirement. The record reveals, however, that two of the employees were given the option to take early retirement because they were eligible to receive a pension. Josephine Chavis was not eligible for a pension from Whitehall. Further, after two employees were terminated for excessive absenteeism, the union requested that they be permitted to resign rather than being terminated. The union made no such request on behalf of Josephine Chavis. Further, there is no evidence that plaintiff would have resigned if offered the option or that she has suffered any injury by not being allowed to resign. Accordingly, such difference in treatment was based on factors unrelated to plaintiff's race and do not show that Whitehall's reason was merely a pretext for discrimination.

The plaintiff also argued that it was unlawful for Whitehall to fire her while she was on sick leave due to an employment injury, claiming that no Caucasian was fired while on sick leave. The plaintiff was not terminated, however, because she was on sick leave but rather because of her excessive absenteeism.[7] The plaintiff has not presented any evidence that a Caucasian employee with a similar excessive absenteeism record was not terminated while on sick leave. The excessive absenteeism policy was directed at excessive absences regardless of the reason for the absence because of the adverse effect on the company. Although it was unfortunate that plaintiff was injured on the job and consequently missed work, that fact does not render Whitehall's decision made pursuant to an attendance policy discriminatory merely because it resulted in the termination of plaintiff.

The plaintiff also argued that the treatment she received by Mr. Mohler with respect to job assignments and comments he made about her personal life show that Whitehall's reasons for terminating her was a pretext. The court finds this argument unpersuasive for two reasons. First, a plaintiff must focus on the specific reason given by the employer in showing pretext and this evidence is not related to absenteeism. Second, the decision to terminate plaintiff was made by Mr. Boveri, not Mr. Mohler who made the comments and job assignments, and Mr. Boveri testified he was not aware of any of the comments or job assignments made by Mr. Mohler.

Other evidence pointed to by plaintiff that Whitehall's stated reason was merely a pretext for discrimination was the testimony of Dorothy Williams, Nathanial Hart and Mark Suggs and plaintiff's own testimony about her conversation with Commie Walls. The statement by Commie Walls that "Don is gonna get your ass" does not contain any direct reference to race and the court would be speculating to infer that it was made with reference to plaintiff's race. As for the testimony of the other three witnesses, the incidents testified to were unrelated to plaintiff's termination or the termination of any other Whitehall employee for excessive absenteeism and the feelings those individuals had that they had been treated differently than Caucasians as a result of those incidents are not probative

---

**7.** Whitehall does not dispute that plaintiff was injured nor that she had not been released by Dr. Sfreddo to return to work at the time of her termination. Dr. Sfreddo first anticipated that plaintiff would be off work for 2 weeks but that time was extended and extended. In the last report submitted by Dr. Sfreddo to Whitehall, Dr. Sfreddo indicated that the plaintiff had no objective indications of medical problems that would prohibit her return to work but because plaintiff felt she could not return to work, he had to extend her sick leave for 3 more weeks. Based on this report, the company logically concluded that plaintiff could be off indefinitely. A company needs employees that will come to work and when faced with the situation presented by Josephine Chavis, decided to terminate her. The fact that she had not been released by Dr. Sfreddo to return to work does not in any way indicate nor support any inference that Whitehall made its decision because of plaintiff's race.

evidence that Whitehall's stated reason for terminating plaintiff was merely a pretext for discrimination.

For the foregoing reasons, this court finds that Josephine Chavis has failed to show that her discharge was motivated in any way by her race. Whitehall discharged plaintiff because of her excessive absenteeism pursuant to an attendance policy applied equally to all employees at Whitehall. This is a legitimate, nondiscriminatory reason and has a solid basis in fact in this case. The plaintiff has not shown that this reason was merely a pretext for discrimination. Accordingly, judgment is entered for defendant, Whitehall Laboratories, Inc. and against plaintiff, Josephine J. Chavis. Under the circumstances of this case, the court exercises its discretion to order that each party is to bear its own costs. SO ORDERED.